**IN THE UNITED STATES DISTRICT COURT**
**FOR THE EASTERN DISTRICT OF PENNSYLVANIA**

| | |
|---|---|
| **ARTURO SILVA, individually and on behalf of the TE CONNECTIVITY RETIREMENT SAVINGS AND INVESTMENT PLAN, and on behalf of all the similarly situated participants and beneficiaries of the plan,**<br><br>**Plaintiff,**<br><br>**v.**<br><br>**TE CONNECTIVITY CORPORATION, TE CONNECTIVITY RETIREMENT ADMINISTRATIVE COMMITTEE, TE CONNECTIVITY INVESTMENT COMMITTEE, and JOHN AND JANE DOES 1–30 in their capacities as fiduciaries,**<br><br>**Defendants.** | **Case No. 2:26-cv-8320** |

## CLASS ACTION COMPLAINT

Plaintiff Arturo Silva ("Plaintiff"), individually and as a representative of a class of similarly situated participants and beneficiaries of the TE Connectivity Retirement Savings and Investment Plan (the "Plan"), brings this Class Action Complaint ("Complaint") under the Employee Retirement Income Security Act of 1974, as amended ("ERISA"), 29 United States Code Sections 1109 and 1132, against TE Connectivity Corporation ("TE Connectivity"), the TE Connectivity Retirement Administrative Committee (the "Administrative Committee"), the TE Connectivity Investment Committee (the "Investment Committee" and together with the Administrative Committee, the "Committees"), and John and Jane Does 1–30 (collectively, "Defendants") for breaching their fiduciary duties in the management, operation, and administration of the Plan.

## I. INTRODUCTION

1. The Plan is a defined contribution plan within the meaning of ERISA § 3(34), 29 U.S.C. § 1002(34). Defined contribution plans, like the Plan, have become the primary form of retirement savings in the United States and can be considered our country's de facto retirement system.

2. As of 2024, the Plan had approximately 15,021 participants and beneficiaries and approximately $3,079,496,417 in assets under management, placing it among the largest 0.056% of all defined contribution plans in the United States. A plan of this size possesses enormous market leverage. It is among the most attractive clients any recordkeeper could serve and should command the most competitive pricing available in the marketplace for recordkeeping and administrative ("RKA") fees.

3. Yet, throughout the Class Period, the Plan paid its recordkeepers approximately $71 per participant per year for RKA services—more than double the fees paid by comparable plans for materially identical services. Comparable defined contribution plans of similar size receiving a suite of RKA services at the same level and quality as the Plan from national recordkeepers paid an average RKA fee of $27 per participant during the same period. Based on a reliable estimate of reasonable fees, the excessive fees cost Plan participants approximately $4.5 million when accounting for compounding investment losses. These excessive RKA fees bore no rational relationship to the actual cost of services rendered or the benefits offered to participants.

4. Excessive fees like these have a devastating impact on participants' retirement security. The participants in defined contribution plans—not the employers—bear the risk of high fees. Every additional expense imposed upon the participants compounds and reduces the value of their retirement savings over time. *Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015). Even

seemingly small differences in fees compound over time: a 1% increase in fees over a 35-year career reduces a participant's retirement account balance by approximately 28%.[1] Every dollar paid in unreasonable RKA fees is a dollar (plus potential gains) lost to Plan participants. ERISA's fiduciary duty provisions exist to prevent precisely this kind of harm.

5. Congress enacted ERISA to protect the interests of participants and beneficiaries in employee benefit plans. 29 U.S.C. § 1001(b). ERISA imposes fiduciary duties of prudence and loyalty on those who manage plan assets and administer plan operations. *See* 29 U.S.C. § 1104(a)(1). ERISA requires a fiduciary to act "solely in the interest of participants . . . for the exclusive purpose of providing benefits to participants and beneficiaries; and defraying reasonable expenses of administering the plan," to do so with "the care, skill, prudence, and diligence" of a prudent person, "in accordance with the documents and instruments governing the plan," and it prohibits a fiduciary from causing a plan to engage in a transaction that constitutes the "furnishing of . . . services" between the plan and a party in interest or the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan." 29 U.S.C. §§ 1104(a)(1)(A), (B), (D); 1106(a)(1)(C)–(D).

6. These fiduciary duties are the "'highest known to the law.'" *See Solis v. Koresko*, 884 F. Supp. 2d 261, 292 (E.D. Pa. 2012) (quoting *Donovan v. Bierwirth*, 680 F.2d 263, 272 n.8 (2d Cir. 1982)). These duties are "strict," *id.*, and require fiduciaries "to deal fairly and honestly with beneficiaries," *Cunningham v. Cornell Univ.*, 604 U.S. 693, 696 (2025) ("*Cunningham*").

7. Defendants—who had the authority and responsibility to select, monitor, and negotiate with the Plan's recordkeepers—breached these duties by failing to ensure that the RKA

[1] *See* United States Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf; *see also Tibble v. Edison Int'l*, 575 U.S. 523, 525 (2015) (recognizing that fees "can sometimes significantly reduce the value of an account in a defined-contribution plan").

fees charged to Plan participants were reasonable in light of the services provided. Plaintiff seeks to recover all losses resulting from Defendants' breaches for the benefit of the Plan and its participants and beneficiaries, as authorized by 29 U.S.C. §§ 1109(a) and 1132(a)(2)–(3).

8. This Complaint alleges two categories of ERISA violations: (1) claims for breach of the fiduciary duty of prudence and for violation of ERISA's prohibited transaction rules, for the Committees' conduct in allowing the Plan to pay excessive and unreasonable fees to the Plan's recordkeepers (Counts I–II); and (2) claims for breach of the fiduciary duties of loyalty and prudence for Defendants' misallocation of the Plan's forfeited plan assets and for violation of ERISA's anti-inurement provision (Counts III–V). Count VI alleges a claim against Defendant TE Connectivity for failure to monitor the Committees.

9. To remedy these fiduciary breaches and ERISA violations, Plaintiff, individually and as a representative of a class of participants and beneficiaries of the Plan, brings this action on behalf of the Plan under 29 U.S.C. § 1132(a)(2) to enforce Defendants' personal liability under 29 U.S.C. § 1109(a) to make good to the Plan all losses resulting from each breach of fiduciary duty and prohibited transaction and to restore to the Plan any profits made through Defendants' use of the Plan's assets. In addition, Plaintiff seeks such other equitable or remedial relief for the Plan as the Court may deem appropriate. Plaintiff, individually and as a representative of a class of participants and beneficiaries of the Plan, also brings claims under 29 U.S.C. § 1132(a)(3) for appropriate equitable relief.

## II. JURISDICTION AND VENUE

10. This Court has subject matter jurisdiction over this action pursuant to 28 U.S.C. § 1331, because it arises under the laws of the United States, and pursuant to ERISA § 502(e)(1), 29 U.S.C. § 1132(e)(1), which provides for federal jurisdiction of actions brought under ERISA.

11. Venue is proper in this District pursuant to ERISA § 502(e)(2), 29 U.S.C. § 1132(e)(2), because the Plan is administered in this District, TE Connectivity maintains its principal place of business in this District, and/or a substantial portion of the events or omissions giving rise to the claims occurred in this District.

12. This Court has personal jurisdiction over each Defendant because each Defendant is either domiciled in, has its principal place of business in, or has sufficient minimum contacts with this District, such that the maintenance of this action does not offend traditional notions of fair play and substantial justice. ERISA also provides for nationwide service of process.

13. Plaintiff's claims are timely under ERISA § 413, 29 U.S.C. § 1113. Each of the breaches and prohibited transactions alleged herein, including each payment of excessive RKA fees from Plan assets, occurred within six years before the filing of this Complaint. Plaintiff did not have actual knowledge of the material facts necessary to understand that Defendants breached their fiduciary duties and engaged in prohibited transactions until shortly before filing this Complaint.

## III. PARTIES

### A. Plaintiff

14. The Plan is a defined contribution, individual account, employee pension benefit plan under 29 U.S.C. § 1002(2)(A) and § 1002(34) that covers eligible employees of TE Connectivity and its participating affiliates and is subject to the provisions of ERISA pursuant to 29 U.S.C. § 1103(a).

15. Plaintiff Arturo Silva is a current participant in the Plan within the meaning of ERISA § 3(7), 29 U.S.C. § 1002(7). Plaintiff resides in Princeton, New Jersey. Plaintiff has been a participant in the Plan since 2013. Throughout the Class Period, Plaintiff paid the Plan's excessive RKA fees and, as a result, suffered losses by way of diminution of his retirement savings in the Plan. Further, Plaintiff suffered actual injuries through the diminishment of his individual Plan account by administrative expenses that should have been paid for with Plan forfeitures. Accordingly, Plaintiff has Article III standing to bring this action on behalf of the Plan and may seek recovery for the entire plan under 29 U.S.C. § 1132(a)(2).

**B. Defendants**

16. Defendant TE Connectivity is a corporation organized under the laws of the Commonwealth of Pennsylvania with its principal place of business located at 680 East Swedesford Road, Suite 100, Wayne, Pennsylvania 19087-1605. TE Connectivity is a wholly owned subsidiary of TE Connectivity plc, a publicly traded public limited company organized under the laws of Ireland that designs and manufactures electrical and electronic components for several industries, including automotive, aerospace, defense, medical, and energy. TE Connectivity plc reported over $17 billion in revenue during its 2025 fiscal year.[2]

17. TE Connectivity is the sponsor of the Plan within the meaning of ERISA § 3(16)(B), 29 U.S.C. § 1002(16)(B). TE Connectivity is a fiduciary of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because it exercises discretionary authority and control over the management and administration of the Plan and has the authority to appoint and remove members of the Committees. Plan § 8.2.

[2] TE Connectivity plc, Annual Report on Form 10-L for fiscal years 2023 through 2025, filed with the Securities and Exchange Commission, at 61 (Sept. 26, 2025).

18. The Administrative Committee is a committee appointed by TE Connectivity to manage the operation and administration of the Plan. The Administrative Committee is the "Plan Administrator" within the meaning of ERISA § 3(16)(A), 29 U.S.C. § 1002(16)(A) and a "Named Fiduciary" for administration within the meaning of ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2). Plan § 8.1 ("The Administrative Committee shall have the sole responsibility for the general administration of the Plan and for carrying out its provisions, and shall be a 'Named Fiduciary' for administration within the meaning of Section 402(a)(2) of ERISA and the 'Plan Administrator' within the meaning of Section 3(16) of ERISA."). The Administrative Committee and its members, in their individual capacities, are fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercise discretionary authority and control over the management and administration of the Plan.

19. The Administrative Committee's 22 enumerated "duties, powers, and discretionary authority" include, but are not limited to: (a) construing and interpreting the Plan, deciding all questions of eligibility and entitlement to benefits, and making determinations regarding the amount, form, and timing of benefit payments; (b) selecting, appointing, and monitoring the Plan's recordkeeper and other service providers, including agents, custodians, accountants, and attorneys; (c) ensuring that fees paid to service providers from Plan assets are reasonable; (d) supervising the preparation and filing of all governmental reports; and (e) adjudicating claims for benefits under the Plan. Plan §§ 8.4(a), 8.7, 8.10.

20. The Investment Committee is a committee appointed by TE Connectivity to manage and oversee the investment of the Plan's assets. The Investment Committee is a "Named Fiduciary" for investments within the meaning of ERISA § 402(a)(2), 29 U.S.C. § 1102(a)(2). Plan § 8.1 ("The Investment Committee shall have such responsibilities as set forth herein, and shall be

a 'Named Fiduciary' for investments within the meaning of Section 402(a)(2) of ERISA."). The Investment Committee and its members, in their individual capacities, are fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), because they exercise discretionary authority and control over the management and investment of the Plan's assets.

21. The Investment Committee's 16 enumerated "duties and powers" include, but are not limited to: (a) selecting and monitoring the Plan's investment options available to participants; (b) appointing and removing the Trustee and entering into the trust agreement; (c) appointing and removing ERISA § 3(38), 29 U.S.C. § 1002(38), investment managers and entering into investment agreements with such managers; (d) selecting the Plan's default investment fund; (e) establishing an investment policy statement for the Plan; and (f) retaining investment consultants to advise the Investment Committee and evaluating the performance of such advisers and managers, taking appropriate action when warranted. Plan § 8.4(b).

22. Both the Administrative Committee and the Investment Committee have the authority to employ recordkeepers, among other agents, and the concomitant duty "to use reasonable care in the selection and retention of any such agent." Plan § 8.7.

23. Defendants John and Jane Does 1–30 (the "Doe Defendants") are individuals who, during the Class Period, served as members of the Committees and/or exercised discretionary authority or control over the management or administration of the Plan or the disposition of the Plan's assets. The Doe Defendants are fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). The identities of the Doe Defendants are not yet known to Plaintiff; their names, roles, and periods of service will be determined through discovery, and Plaintiff will amend this Complaint to identify them by name when their identities are ascertained.

## IV. ERISA'S FIDUCIARY STANDARDS

24. ERISA defines a "fiduciary" as any person who exercises discretionary authority or discretionary control respecting management of a plan, exercises any authority or control respecting management or disposition of its assets, or has any discretionary authority or discretionary responsibility in the administration of a plan. ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A). Fiduciary status under ERISA is determined by function, not title. *See Srein v. Frankford Tr. Co.*, 323 F.3d 214, 220 (3d Cir. 2003) (quoting *Mertens v. Hewitt Assocs.*, 508 U.S. 248, 262 (1993)) (explaining that ERISA defines "fiduciary" "not in terms of formal trusteeship, but in functional terms of control and authority over the plan"); *see also Edmonson v. Lincoln Nat'l Life Ins. Co.*, 725 F.3d 406, 413 (3d Cir. 2013) (citing *Curcio v. John Hancock Mut. Life Ins. Co.*, 33 F.3d 226, 233 (3d Cir. 1994) ("The definition of a fiduciary under ERISA is to be broadly construed."). The functional test derives from ERISA's statutory definition itself. *See* ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A).

25. Each Defendant is a fiduciary of the Plan because each exercised discretionary authority or control respecting management of the Plan and/or disposition of its assets, or had discretionary authority or responsibility in the administration of the Plan, during the Class Period.

26. ERISA imposes the fiduciary duties of loyalty and prudence on employers and plan fiduciaries. ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). Like other appellate courts, the Third Circuit has "dubbed these twin fiduciary duties 'the highest known to the law.'" *Pinnell v. Teva Pharm. USA, Inc.*, No. CV 19-5738, 2020 WL 1531870, at *3 (E.D. Pa. Mar. 31, 2020) (quoting *Sweda v. Univ. of Pa.*, 923 F.3d 320, 333 (3d Cir. 2019)).

27. Specifically, a fiduciary must "discharge his duties with respect to a plan solely in the interest of the participants and beneficiaries . . . for the exclusive purpose of . . . providing

benefits to participants and their beneficiaries; and . . . defraying reasonable expenses of administering the plan." ERISA § 404(a)(1)(A), 29 U.S.C. § 1104(a)(1)(A). And a fiduciary must exercise "the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims." ERISA § 404(a)(1)(B), 29 U.S.C. § 1104(a)(1)(B).

28. The duty of prudence obligates a fiduciary to conduct an objective, thorough, and analytical review of available investment options and service providers before making selections and to monitor those selections on a continuing basis. *See Hughes v. Nw. Univ.*, 595 U.S. 170, 175–77 (2022). Fiduciaries must ensure that fees charged to the plan for RKA services remain reasonable in light of the level and quality of services provided and take corrective action when fees become unreasonable.[3] *See Mator v. Wesco Distrib., Inc.*, 102 F.4th 172, 181, 185–88 (3d Cir. 2024) (quoting *Hughes v. Nw. Univ.*, 63 F.4th 615, 626 (7th Cir. 2023)). There is no presumption that a fiduciary acted prudently. *Fifth Third Bancorp v. Dudenhoeffer*, 573 U.S. 409, 418–19 (2014).

29. The duty of loyalty requires that fiduciaries act with an "eye single" to the interests of plan participants and beneficiaries. *See Reich v. Compton*, 57 F.3d 270, 291 (3d Cir. 1995) (quoting *Donovan*, 680 F.2d at 271).

30. Additionally, a fiduciary that has the power to appoint and remove other plan fiduciaries has a duty to monitor those appointees. *See Scalia v. WPN Corp.*, 417 F. Supp. 3d 658, 669 (W.D. Pa. 2019) (quoting *Coyne & Delany Co. v. Selman*, 98 F.3d 1457, 1465 (4th Cir. 1996)).

---

[3] *See* United States Dep't of Labor, *A Look at 401(k) Plan Fees*, at 2 (Sept. 2019), https://www.dol.gov/sites/dolgov/files/ebsa/about-ebsa/our-activities/resource-center/publications/401k-plan-fees.pdf.

## V. FACTS APPLICABLE TO ALL COUNTS

### A. The Plan

31. The Plan is a defined contribution retirement plan established pursuant to 29 U.S.C. § 1002(2)(A) and § 1002(34) of ERISA that permits eligible participants to contribute a portion of their eligible compensation on a pre-tax basis, an after-tax basis, or as Roth contributions, or any combination thereof. 2025 Form 5500, Notes to Financial Statements, at 7–8.

32. As of 2025, the Plan had approximately 13,509 participants and beneficiaries and held $3,340,167,936 in net assets, making it one of the largest retirement plans in the country.

**Table 1: Plan Demographics**[4]

| Year | Participants | Assets |
|---|---|---|
| 2020 | 15,916 | $2,892,574,663 |
| 2021 | 16,075 | $3,158,085,216 |
| 2022 | 16,214 | $2,428,843,094 |
| 2023 | 15,824 | $2,795,715,682 |
| 2024 | 15,021 | $3,079,496,417 |
| 2025 | 13,509 | $3,340,167,936 |
| ***Average*** | ***15,427*** | ***$2,949,147,168*** |

33. A plan of this size is among the most attractive clients for any recordkeeper. With an average of 15,427 participants and over $2.9 billion in assets between 2020 and 2025, the Plan has, and at all relevant times has had, substantial bargaining power to command the most competitive RKA fees in the marketplace. Large plans regularly negotiate per-participant RKA fees that are a fraction of what smaller plans pay, reflecting the economies of scale inherent in recordkeeping services.

34. Because plans of this size are the most sought-after clients in the recordkeeping marketplace and recordkeepers compete aggressively for their business, a prudent fiduciary of a

[4] All data sourced from Form 5500 Annual Returns, Line 6g / 6g(2) (participants) and Schedule H, Line 11 (net assets).

plan of this size would leverage that competitive dynamic to negotiate per-participant recordkeeping fees at or below the lowest rates available in the market, not among the highest.

## VI. ALLEGATIONS REGARDING IMPRUDENT CONDUCT WITH RESPECT TO RECORDKEEPING FEES

### A. RKA Services, Generally

35. The term "recordkeeping" is a catchall term for the suite of administrative services typically provided to a defined contribution plan by the plan's "recordkeeper," *i.e.*, the operational services necessary to maintain participant accounts, process transactions, and administer the plan in compliance with ERISA and the Internal Revenue Code. These services are standardized across all major national recordkeepers and, for large defined contribution plans, are essentially a commodity. Recordkeeping and administrative services fees are one and the same and the terms are used synonymously herein and referred to as RKA.

36. There are two essential RKA services provided by all national recordkeepers for large plans with substantial bargaining power (like the Plan). First, an overall suite of recordkeeping services is provided to large plans as part of a "bundled" fee for a buffet-style level of service (meaning that the services are provided, in retirement industry parlance, on an "all-you-can-eat" basis), including, but not limited to, the following services:

- Basic account recordkeeping (*e.g.*, demographic, source, investment and vesting records);
- Multi-channel participant and plan sponsor access (*e.g.*, phone, web);
- Daily participant transaction accounting (*e.g.*, purchases, redemptions, exchanges);
- Payroll service (*e.g.*, hardships, in-service withdrawals, termination distributions);
- Participant tax reporting services (*e.g.*, IRS Form 1099-R);
- Participant confirmations, statements, and standard notices;

- Plan-level reporting and annual financial package (excluding IRS Form 5500);
- Participant education (*e.g.*, newsletters, web articles, standard communication materials); and
- Plan consulting (*e.g.*, preapproved document services, operational materials).

37. This suite of essential recordkeeping services can be referred to as "bundled" services. These services are offered by all recordkeepers for one price (typically at a per capita price), regardless of the services chosen or utilized by the plan. As explained in more detail below, the services chosen by a large plan do not affect the amount charged by recordkeepers for such basic and fungible services.

38. The second type of essential recordkeeping services, hereafter referred to as "à la carte" services, provided by all national recordkeepers, often has separate, additional fees based on the conduct of individual participants and the usage of the services by individual participants. These fees are distinct from the bundled arrangement described above to ensure that one participant is not forced to help another cover the cost of, for example, taking a loan from their plan account balance. These à la carte services typically include, but are not limited to, the following:

- Loan processing;
- Brokerage services/account maintenance (if offered by the plan);
- Distribution services; and
- Processing of qualified domestic relations orders.

39. To the extent that recordkeepers offer certain services on an à la carte basis in addition to the bundled RKA services, any differences in the usage and fees for these à la carte services have an immaterial impact on the total RKA fees charged to large plans. The à la carte service fee rates are not materially different across recordkeepers for plans of comparable size.

Moreover, the utilization rates for these services do not vary materially across large plans, and any variation that does exist cannot reasonably explain the fee disparities at issue in this case.

40. The cost of providing recordkeeping services depends in large part on the number of participants in a plan. Plans with large numbers of participants can take advantage of economies of scale by negotiating a lower per-participant recordkeeping fee.[5] When more participants in a plan are on a recordkeeping platform, the recordkeeper allocates its fixed costs over a larger participant base, which reduces the per-participant cost. As a result, the cost to add a new participant to a plan is relatively low. And as the overall number of participants increases, the average cost per participant decreases. Because recordkeeping expenses are driven by the number of participants in a plan, the vast majority of plans are charged on a per-participant basis.[6]

41. "It's no secret to retirement industry professionals and fiduciaries that recordkeeping services are fungible."[7] Indeed, industry experts have long maintained that for large retirement plans, prudent fiduciaries should treat RKA services as a commodity when negotiating with recordkeepers. As one industry publication has explained: "Custody and recordkeeping are 'commodity' services. Like any commodity, given materially equal quality, the key benchmark for these services is price. The cheaper you can find competent custody and recordkeeping services, the better for participants."[8]

---

[5] *See* Economic Systems, Inc., *Study of 401(k) Plan Fees and Expenses* (submitted to U.S. Dep't of Labor, Pension and Welfare Benefits Admin., Apr. 13, 1998), https://www.dol.gov/sites/dolgov/files/EBSA/researchers/analysis/retirement/study-of-401k-plan-fees-and-expenses.pdf ("Basic per-participant administrative charges typically reflect minimum charges and sliding scales that substantially reduce per capita costs as plan size increases.").

[6] *See* Mercer, *Defined Contribution Plan Fee Practices* (2024), https://www.mercer.com/assets/us/en_us/shared-assets/local/attachments/pdf-dc-plan-fee-practices.pdf.

[7] Lauren K. Valastro, *How Misapplying* Twombly *Erodes Retirement Funds*, 32 GEO. MASON L. REV. 421, 457 (2025).

[8] Eric Droblyen, *Evaluating 401(k) Providers: Separating Commodity from Value-Added Services*, EMP. FIDUCIARY (Feb. 10, 2015), https://www.employeefiduciary.com/blog/evaluating-401k-providers-separating-commodity-value-added-services.

42. The recordkeeping industry itself has also long recognized that RKA services for large plans are commoditized. On March 27, 2023, the National Association of Plan Advisors ("NAPA"), which describes itself as "the only advocacy group exclusively focused on the issues that matter to retirement plan advisors,"[9] surveyed its members and posed the question: "Is recordkeeping a commodity?"[10] The results, published on March 31, 2023, were unambiguous: 71% of all respondents agreed that the services provided by recordkeepers to retirement plans are commodities.[11] And of the subset of respondents who were themselves recordkeepers or third-party administrators, 65% agreed these services are commodities.

43. Recordkeepers compete on price, not on the substance of the core services they provide, because those core services are materially identical across providers. And because the RKA offerings provided by recordkeepers are materially identical commodities, it is the standard and prevailing practice for retirement plan fiduciaries and advisors to request quotes by asking what the recordkeeper's revenue requirement is on a per-participant basis for providing the bundled RKA services.

44. For this reason, prudent plan fiduciaries following the standard of care treat the services provided by recordkeepers as a commodity when ensuring that they pay only reasonable fees for those services. This approach achieves the best results for the exclusive benefit of plan participants as required by ERISA, because it enables objective, apples-to-apples comparisons of recordkeeping pricing across providers and eliminates the ability of an incumbent recordkeeper to justify excessive fees by claiming illusory service differentiation.

---

[9] Nat'l Ass'n of Plan Advisors, *About Us*, https://www.napa-net.org/about/ (last visited Oct. 7, 2026).
[10] Nevin E. Adams, *Is Recordkeeping a "Commodity?"*, NAPA-NET (Mar. 27, 2023), https://www.napa-net.org/news/2023/3/recordkeeping-commodity/.
[11] Nevin E. Adams, Reader Radar: Service (Still) Separates Recordkeepers, NAPA-NET (Mar. 31, 2023), https://www.napa-net.org/news/2023/3/reader-radar-service-still-separates-recordkeepers/.

45. In summary, comparisons of the total RKA fees paid by similarly sized plans are meaningful and provide a reliable basis for determining whether an inference of imprudence is warranted. Because all major recordkeepers provide the same core bundled RKA services, because any variations in à la carte services are immaterial to pricing, and because per-participant fees reflect the true cost of recordkeeping regardless of plan-specific asset levels, a comparison of per-participant RKA fees across similarly situated plans constitutes an apples-to-apples comparison of RKA costs.

46. ERISA's duty of prudence does not end when a fiduciary selects a recordkeeper. Fiduciaries have "a continuing duty to monitor" plan investments and service arrangements and to remove imprudent ones. *Tibble v. Edison Int'l*, 575 U.S. 523, 529 (2015); *accord Hughes*, 595 U.S. at 177. A recordkeeper's fees that were reasonable when a plan first engaged the provider may become excessive over time as the plan grows, as competition drives down market pricing, or as technology reduces the cost of providing services. Accordingly, fiduciaries must reassess the reasonableness of recordkeeping compensation on an ongoing basis.

47. The prevailing standard of care requires fiduciaries of large plans to (a) benchmark the plan's RKA fees against those of similarly sized plans on a regular basis, at least every other year; and (b) conduct a competitive request for proposal ("RFP") for recordkeeping services approximately every three to five years, regardless of whether the plan sponsor is satisfied with its incumbent provider. Leading retirement plan advisory firms, including CapTrust, RPAG, and NEPC, treat periodic benchmarking and competitive bidding as baseline fiduciary practices.[12]

[12] *See, e.g.*, CapTrust, *Evaluating Retirement Plan Fees, Part One: A Holistic Approach* (Jan. 10, 2024), https://www.captrust.com/resources/retirement-plan-fees-part-1/ (recommending "benchmark[ing] these [RKA] fees and services every one to three years, with a more formal recordkeeper search-and-selection process conducted approximately every five to seven years").

48. Consistent with these principles, Mercer's best-practice guidance for defined contribution plan governance recommends that fiduciaries price administrative fees on a per-participant basis, benchmark and negotiate recordkeeping fees separately from investment management fees, benchmark fees at least every other year, and review services annually to identify opportunities to reduce costs. See Mercer, Defined Contribution Plan Fee Practices (2024).

49. Fiduciaries of a plan the size of the Plan, with an average of more than 15,000 participants and approximately $3 billion in assets, have the resources and leverage to follow these practices at minimal cost. As alleged below, Defendants did not.

**B. The Plan's Recordkeeping Arrangement**

50. During the Class Period, the Plan had two recordkeepers: (1) until July 1, 2021, Northwest Plan Services, Inc. ("Northwest") served as the Plan's recordkeeper; and (2) after July 1, 2021, Empower Retirement ("Empower") served as the Plan's recordkeeper. *See* 2021 Form 5500, Notes to Financial Statements at 12.

51. Northwest and Empower (together, the "Recordkeepers") are each a "party in interest" with respect to the Plan within the meaning of ERISA § 3(14)(B), 29 U.S.C. § 1002(14)(B), because each was, during its tenure, "a person providing services to [the] plan." Each Recordkeeper was a party in interest at the time of each renewal, extension, or amendment of its recordkeeping arrangement, and each payment of RKA fees from Plan assets during the Class Period occurred while it was servicing the Plan.

52. Northwest provided and Empower provides the Plan with the full suite of bundled RKA services described above, including recordkeeping, transaction processing, participant communications, plan document services, compliance support, and directed trustee/custodial services. The services provided to the Plan are not materially different from the services Northwest

or Empower provides to its other large defined contribution plan clients. The comparator plans identified in Table 3 below received the same core bundled RKA services from their recordkeepers, at the same level and quality, as the Plan received from Northwest and Empower, and any differences in à la carte services among those plans were immaterial to total RKA fees.

53. At all relevant times, participants have been "charged a flat fee for recordkeeping services."[13]

### C. Plan Participants Paid Excessive RKA Fees

54. During the Class Period, the Plan paid Northwest and Empower approximately $6.6 million in direct compensation alone for RKA services as set forth in Table 2 below. The fee data is derived from the Plan's Form 5500 annual returns filed with the Department of Labor.

**Table 2: Total Recordkeeping and Administration (Total RKA) Fees**

| | **2020** | **2021** | **2022** | **2023** | **2024** | **2025** | ***Average*** |
|---|---|---|---|---|---|---|---|
| **Recordkeeper** | Northwest | Northwest/ Empower[14] | Empower | Empower | Empower | Empower | |
| **Participants** | 15,916 | 16,075 | 16,214 | 15,824 | 15,021 | 13,509 | ***15,427*** |
| **Est. Total RKA Fees** | $943,147[15] | $1,527,064[16] | $1,109,794[17] | $1,138,518[18] | $1,103,355[19] | $821,230[20] | ***$1,107,185*** |
| **Est. Total RKA Per Participant** | $59 | $95 | $68 | $72 | $73 | $61 | ***$71*** |

---

[13] 2020 Form 5500, Notes to Financial Statements at 10; 2021 Form 5500, Notes to Financial Statements at 12; 2022 Form 5500, Notes to Financial Statements at 12; 2023 Form 5500, Notes to Financial Statements at 11; 2024 Form 5500, Notes to Financial Statements at 11; 2025 Form 5500, Notes to Financial Statements at 11.

[14] Great-West Life & Annuity Ins. was a brand used by Empower until 2022. *See* John Sullivan, *With an Empowering Move, Great-West Goes Away*, 401K SPECIALIST (Aug. 2, 2022), https://401kspecialistmag.com/with-an-empowering-move-great-west-goes-away/.

[15] 2020 Form 5500 at Schedule C.

[16] 2021 Form 5500 at Schedule C.

[17] 2022 Form 5500 at Schedule C.

[18] 2023 Form 5500 at Schedule C.

[19] 2024 Form 5500 at Schedule H, line 2(i)(3).

[20] 2025 Form 5500 at Schedule H, line 2(i)(3).

55. As Table 2 demonstrates, throughout the Class Period, from 2020 through 2025, the Plan paid Northwest and Empower an average of approximately $71 per participant per year for RKA services. In 2021, the Plan paid as much as $95 per participant. Notably, fees *increased* after the Plan changed its recordkeeper to Empower in 2021 even though participant counts remained stable.

56. Comparing the Plan's RKA fees to other similarly situated plans' RKA fees during the Class Period reveals that the Plan was paying higher RKA fees than its peers.

**Table 3: The Plan's RKA Fees vs. Peer Plan RKA Fees**

| **Plan Name** | **Recordkeeper** | **Assets Under Management** | **Partici pants** | **Schedule C Codes** | **RKA Fees** | **RKA Fees Per Participant** |
|---|---|---|---|---|---|---|
| Plan Year 2020 | | | | | | |
| Bechtel Trust & Thrift Plan | Empower | $6,167,268,074 | 16,170 | 15 30 37 49 50 62 64 | $500,139 | $31 |
| Presbyterian Healthcare Services 401(a) Plan | Fidelity | $372,574,088 | 12,624 | 15 37 50 64 65 | $246,059 | $19 |
| FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | Vanguard | $1,051,387,744 | 19,354 | 15 16 21 25 26 37 50 52 57 | $444,784 | $23 |
| First American Financial Corporation 401(k) Savings Plan | Fidelity | $2,022,536,287 | 16,202 | 37 60 64 65 71 | $679,500 | $42 |
| PG&E Corporation Retirement Savings Plan | Fidelity | $3,781,395,000 | 12,273 | 37 64 65 71 | $350,111 | $29 |
| Expeditors International of Washington, Inc. 401(k) Plan | T. Rowe Price | $811,144,504 | 8,173 | 15 21 25 28 37 38 49 50 52 59 62 64 65 | $410,107 | $50 |
| **TE Connectivity Retirement Savings and Investment Plan** | **Northwest** | **$2,892,574,663** | **15,916** | **13 15 37 38 50 64 65 / 21 64** | **$943,147** | **$59** |
| Plan Year 2021 | | | | | | |
| Bechtel Trust & Thrift Plan | Empower | $6,474,054,626 | 15,509 | 15 30 37 49 50 62 64 | $402,271 | $26 |
| Presbyterian Healthcare Services 401(a) Plan | Fidelity | $442,925,075 | 13,187 | 15 37 50 64 65 | $321,178 | $24 |
| FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | Vanguard | $1,218,209,533 | 20,072 | 15 16 21 25 26 37 50 52 57 | $381,345 | $19 |
| First American Financial Corporation 401(k) Savings Plan | Fidelity | $2,358,533,098 | 17,487 | 37 60 64 65 71 | $674,488 | $39 |

| | | | | | | |
|---|---|---|---|---|---|---|
| PG&E Corporation Retirement Savings Plan | Fidelity | $4,285,161,000 | 12,994 | 37 64 65 71 | $432,522 | $33 |
| Expeditors International of Washington, Inc. 401(k) Plan | T. Rowe Price | $976,068,028 | 8,937 | 15 21 25 28 37 38 49 50 52 59 62 64 65 | $343,520 | $38 |
| **TE Connectivity Retirement Savings and Investment Plan** | **Northwest / Empower** | **$3,158,085,216** | **16,075** | **13 15 37 38 50 64 65 / 21 64 / 64 50 15 37** | **$1,527,064** | **$95** |
| Plan Year 2022 | | | | | | |
| Bechtel Trust & Thrift Plan | Empower | $5,111,831,764 | 15,508 | 15 30 37 49 50 62 64 | $384,666 | $25 |
| Presbyterian Healthcare Services 401(a) Plan | Fidelity | $372,088,163 | 13,101 | 15 37 50 64 65 | $261,708 | $20 |
| FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | Vanguard | $1,076,210,385 | 20,817 | 15 16 21 25 26 37 50 52 57 | $201,579 | $10 |
| First American Financial Corporation 401(k) Savings Plan | Fidelity | $1,940,519,380 | 17,854 | 37 60 64 65 71 | $655,241 | $37 |
| PG&E Corporation Retirement Savings Plan | Fidelity | $3,574,725,000 | 12,847 | 37 64 65 71 | $633,511 | $49 |
| Expeditors International of Washington, Inc. 401(k) Plan | T. Rowe Price | $839,061,386 | 9,597 | 15 21 25 28 37 38 49 50 52 59 62 64 65 | $293,717 | $31 |
| **TE Connectivity Retirement Savings and Investment Plan** | **Empower** | **$2,428,843,094** | **16,214** | **64 50 37 15** | **$1,109,794** | **$68** |
| Plan Year 2023 | | | | | | |
| Bechtel Trust & Thrift Plan | Empower | $5,688,538,867 | 15,670 | 15 30 37 49 50 62 64 | $351,627 | $22 |
| Presbyterian Healthcare Services 401(a) Plan | Fidelity | $455,354,701 | 13,570 | 15 37 50 64 65 | $217,029 | $16 |
| FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | Vanguard | $1,270,937,672 | 20,327 | 15 16 21 25 26 37 50 52 57 | $249,249 | $12 |
| First American Financial Corporation 401(k) Savings Plan | Fidelity | $2,270,369,077 | 16,418 | 37 60 64 65 71 | $673,259 | $41 |
| PG&E Corporation Retirement Savings Plan | Fidelity | $4,250,175,000 | 13,616 | 37 64 65 71 | $807,168 | $59 |
| Expeditors International of Washington, Inc. 401(k) Plan | T. Rowe Price | $1,030,902,759 | 9,082 | 15 21 25 28 37 38 49 50 52 59 62 64 65 | $198,692 | $22 |
| **TE Connectivity Retirement Savings and Investment Plan** | **Empower / Northern Trust** | **$2,795,715,682** | **15,824** | **64 50 37 15 / 21 64** | **$1,138,518** | **$72** |
| Plan Year 2024 | | | | | | |
| Bechtel Trust & Thrift Plan | Empower | $6,064,963,829 | 15,811 | 15 30 37 49 50 62 64 | $403,546 | $26 |
| Presbyterian Healthcare Services 401(a) Plan | Fidelity | $531,349,690 | 13,906 | 15 37 50 64 65 | $204,346 | $15 |

| | | | | | | |
|---|---|---|---|---|---|---|
| FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | Vanguard | $1,421,158,765 | 20,115 | 15 16 21 25 26 37 50 52 57 | $331,954 | $17 |
| First American Financial Corporation 401(k) Savings Plan | Fidelity | $2,524,037,941 | 16,531 | 37 60 64 65 71 | $517,207 | $31 |
| PG&E Corporation Retirement Savings Plan | Fidelity | $4,856,734,000 | 13,873 | 37 64 65 71 | $260,213 | $19 |
| Expeditors International of Washington, Inc. 401(k) Plan | T. Rowe Price | $1,195,052,910 | 9,205 | 15 21 25 28 37 38 49 50 52 59 62 64 65 | $179,429 | $19 |
| **TE Connectivity Retirement Savings and Investment Plan** | **Empower / Northern Trust** | **$3,079,496,417** | **15,021** | **15 37 50 64 / 21 64** | **$1,103,355** | **$73** |
| Plan Year 2025 | | | | | | |
| Bechtel Trust & Thrift Plan | Empower | $6,710,221,362 | 16,956 | 15 30 37 49 50 62 64 | $420,473 | $25 |
| Presbyterian Healthcare Services 401(a) Plan | Fidelity | $632,550,230 | 14,766 | 15 37 50 64 65 | $217,659 | $15 |
| FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan | Vanguard | $1,609,505,692 | 17,563 | 15 16 21 25 26 37 50 52 57 | $341,752 | $19 |
| First American Financial Corporation 401(k) Savings Plan | Fidelity | $2,855,518,393 | 16,586 | 37 60 64 65 71 | $511,295 | $31 |
| PG&E Corporation Retirement Savings Plan | Fidelity | $5,690,666,000 | 14,425 | 37 64 65 71 | $308,701 | $21 |
| Expeditors International of Washington, Inc. 401(k) Plan | T. Rowe Price | $1,382,962,237 | 9,692 | 15 21 25 28 37 38 49 50 52 59 62 64 65 | $198,586 | $20 |
| **TE Connectivity Retirement Savings and Investment Plan** | **Empower** | **$3,340,167,936** | **13,509** | **37 50 64** | **$821,230** | **$61** |

57. Table 3 shows that comparable plans of similar size, in terms of assets and participants, receiving materially identical RKA services paid a fraction of what the Plan paid. It also shows that the Plan's excessive fees persisted throughout the entire Class Period, year after year, as Defendants failed to take any successful action to reduce or negotiate the Plan's RKA fees.

58. The "Schedule C Codes" column in Table 3 reflects the codes each plan reported on Schedule C to its Form 5500 for its recordkeeping providers. Schedule C requires a large plan to identify each service provider that received $5,000 or more in direct or indirect compensation in connection with services rendered to the plan and to describe, using standardized codes

prescribed by the Department of Labor, both the types of services the provider rendered (codes 10 through 49) and the types of compensation the provider received (codes 50 through 99).

59. The service codes reported in Table 3 identify the following services: 13 (contract administrator); 15 (recordkeeping and information management, including computing, tabulating, and data processing); 16 (general consulting); 21 (trustee—bank, trust company, or similar financial institution); 25 (directed trustee); 26 (investment advisory services to participants); 28 (investment management); 30 (plan employee); 37 (participant loan processing); 38 (participant communication); and 49 (other services). The compensation codes reported in Table 3 identify how the providers were paid: 50 (direct payment from the plan); 52 (investment management fees paid indirectly by the plan); 57 (redemption fees); 59 (shareholder servicing fees); 60 (sub-transfer agency fees); 62 (float revenue); 64 (recordkeeping fees); 65 (account maintenance fees); and 71 (securities brokerage commissions and fees).

60. Service codes 15, 37, and 38 describe the core bundled and à la carte RKA services described above—maintaining participant account records, processing participant transactions and loans, and communicating with participants—and compensation codes 64 and 65 reflect payment for those services. Codes 13 (contract administrator) and 21 (trustee) describe administrative and custodial functions that are routinely provided as part of a bundled recordkeeping arrangement for a large plan; they do not represent premium or specialized services.

61. The Schedule C codes confirm that the comparator plans received the same core RKA services as the Plan and, in many instances, more. Every comparator plan reported participant loan processing (code 37) in every year of the Class Period, and every comparator plan reported recordkeeping services (code 15), recordkeeping fees (code 64), or both, in every year. The Plan reported these same core codes, supplemented in certain years by codes 13, 21, 38, and 65. In

2025, the Plan reported only codes 37, 50, and 64—fewer codes than any comparator plan reported that year—yet paid $61 per participant, approximately two to four times the $15 to $31 per participant paid by the comparator plans in the same year.

62. Several comparator plans reported services that the Plan's providers never reported at all. For example, the Expeditors International of Washington, Inc. 401(k) Plan reported thirteen codes in every year, including directed trustee services (code 25), investment management (code 28), and other services (code 49), yet paid between $19 and $50 per participant during the Class Period. Similarly, the FedEx Office and Print Services, Inc. 401(k) Retirement Savings Plan reported general consulting (code 16), directed trustee services (code 25), and investment advisory services to participants (code 26), yet paid between $10 and $23 per participant during the Class Period.

63. The comparison is particularly stark with respect to Empower, which served as recordkeeper to both the Plan and the Bechtel Trust & Thrift Plan. For the Bechtel plan, Empower's Schedule C reflected codes 15, 30, 37, 49, 50, 62, and 64—every code reported for Empower's services to the Plan, plus additional codes. Yet from 2022 through 2025, the Bechtel plan paid between $22 and $26 per participant, while the Plan paid between $61 and $73 per participant **for fewer services from the same recordkeeper**.

64. Nothing in the Plan's Schedule C filings indicates that Northwest or Empower provided services to the Plan that were superior in kind, scope, or quality to the services received by the comparator plans. Other than code 13 (contract administrator), the Plan's providers reported no service code that was not also reported by at least one comparator plan paying a fraction of the Plan's fees. And Northwest reported code 13 only in 2020 and 2021; Empower never reported it. After code 13 disappeared from the Plan's filings, the Plan's per-participant RKA fees remained

more than double the comparator-plan average in every year from 2022 through 2025, confirming that code 13 does not account for the disparity.

65. Even if the Plan's recordkeepers had provided some incremental service not captured by the Schedule C codes, no such service could justify a premium of the magnitude reflected in Table 3. As alleged above, RKA services for large plans are a commodity, and bundled RKA services are priced on a per-participant basis regardless of the particular services a plan selects or uses. A per-participant fee two to four times higher than that of comparable plans—resulting in millions of dollars in excess fees over the Class Period—cannot be explained by marginal variations in service features, particularly where comparator plans of similar size received the same or broader services from the same national recordkeepers, including Empower itself.

66. The Plan's service agreements, fee disclosures, and any documentation of additional services allegedly provided are in Defendants' exclusive possession. But the publicly reported Schedule C data—the very data a prudent fiduciary would review when benchmarking the Plan's RKA fees—reflects no service differential that could justify the Plan paying more than double what comparable plans paid for materially identical RKA services.

67. The Plan's $71 per-participant average fee from 2020 to 2025 is approximately 163% greater than the average fee of $27 per participant from 2020 to 2025 for the plans listed above.

68. This vast discrepancy between the Plan's RKA fees and comparable plans existed for all years from 2020 through 2025. Indeed, the figures in Table 3 above are just examples of the Plan's excessive RKA fees from 2020 through 2025.

69. The Plan should have been able to obtain per-participant recordkeeping fees of no more than $27 per participant, and likely even less. This fee is consistent with the average recordkeeping fees paid by similar plans in the country, as demonstrated above.

70. Given the size of the Plan during the Class Period, in addition to the general trend toward lower recordkeeping expenses in the marketplace as a whole, the Plan could have obtained recordkeeping services that were comparable to or superior to the typical services provided by the Plan's recordkeepers at a lower cost.

71. But Defendants failed to monitor the Plan's RKA fees, leverage the Plan's size, and obtain a reasonable fee. As a result, Plan participants paid more than double (*i.e.*, 2.6 times) a reasonable fee. This disparity is not a matter of marginal differences in judgment; it strongly supports an inference of imprudence. *See Mator*, 102 F.4th at 195 (reversing dismissal where plan paid "about two to four times what comparable plans paid" for recordkeeping services); *Kruchten v. Ricoh USA, Inc.*, No. 23-1928, 2024 WL 3518308, at *4 (3d Cir. July 24, 2024) (fee differential of approximately two times industry average supported a plausible claim).

72. Throughout the Class Period, the Plan's RKA fees remained persistently excessive, which indicates that the fiduciaries of the Plan—specifically, the Committees and their members—systematically failed to conduct the review and analysis necessary to satisfy their fiduciary duties. This failure is not attributable to complexity or ambiguity because recordkeeping fees are a material, quantifiable, and easily reviewable plan expense. Instead, this failure reflects a pattern of indifference and rubber-stamp oversight.

73. As evidenced by the RKA fee premium paid by Plan participants, the Committees did not adequately leverage the Plan's size to negotiate a favorable RKA fee when they selected Empower as the Plan's recordkeeper in 2021 or earlier when Northwest was the Plan's

recordkeeper. The Plan's fiduciaries failed to properly conduct RFPs, requests for information, or benchmarking for RKA services during the Class Period. Had they done so, they would have discovered the Plan's RKA fees were excessive.

74. Lower-cost alternatives were not merely "available" in the abstract sense; they were actively being retained by peer organizations in real time. The comparator evidence demonstrates that recordkeepers were willing to serve comparable plans at substantially lower per-participant rates. For instance, Empower (the Plan's recordkeeper) charged the Bechtel Trust & Thrift Plan less than half of what it charged the Plan for materially the same level and quality of services.

75. From 2020 through 2025, the comparator plans had participant counts comparable to the Plan's, and most had fewer, which means the comparators generally had similar or less bargaining power than the Plan, and the Plan still paid RKA fees that were disproportionate and unreasonable in comparison.

76. Plan participants paid millions in excessive RKA fees over the Class Period. As shown below in Table 4, accounting for the time value of the excess fees (that is, the investment returns that Plan participants would have earned on those dollars had they not been diverted to pay unreasonable recordkeeping fees) participants suffered losses of a total cumulative amount of approximately $4.5 million.

**Table 4: Total Recordkeeping and Administration (Total RKA) Fees Cumulative Losses**

| | 2020 | 2021 | 2022 | 2023 | 2024 | 2025 |
|---|---|---|---|---|---|---|
| **Recordkeeper** | Northwest | Northwest / Empower | Empower | Empower | Empower | Empower |
| **Participants** | 15,916 | 16,075 | 16,214 | 15,824 | 15,021 | 13,509 |
| **Est. Total RKA Fees** | $943,147 | $1,527,064 | $1,109,794 | $1,138,518 | $1,103,355 | $821,230 |
| **Est. Total RKA Per Participant** | $59 | $95 | $68 | $72 | $73 | $61 |
| **Reliable Est. of Reasonable Total RKA** | $32 | $30 | $29 | $29 | $21 | $22 |

| | | | | | | |
|---|---|---|---|---|---|---|
| **Fees Per Participant** | | | | | | |
| **Reliable Est. of Reasonable Total RKA Fees** | $509,312 | $482,250 | $470,206 | $458,896 | $315,441 | $297,198 |
| **Est. Conservative Total RKA Losses** | $433,835 | $1,044,814 | $639,588 | $679,622 | $787,914 | $524,032 |
| **Est. Conservative Cumulative[21] Total RKA Losses** | $433,835 | $1,478,649 | $2,118,237 | $2,797,859 | $3,585,773 | **$4,109,805** |

## VII. ALLEGATIONS REGARDING IMPROPER ALLOCATION OF FORFEITURES

### A. TE Connectivity's Matching Contributions

77. In general, all employees of TE Connectivity have been eligible to participate in the Plan upon satisfying the Plan's age and service requirements. Eligible employees are automatically enrolled in the Plan at a default deferral rate of 5% (excluding eligible employees who were automatically enrolled prior to January 1, 2012, who had a default deferral rate of 2%). Plan § 2.2(a). Effective August 1, 2016, automatically enrolled employees were subject to an automatic "escalator," which increased their default deferral rate by 1% per year, with a maximum default deferral rate of 10%. *Id.* § 2.2(c)(i).

78. Throughout the Class Period, the Plan has been funded by a combination of elective deferrals by Plan participants and company contributions, each of which is deposited into the Plan's trust fund and allocated to individual participant accounts.

79. Throughout the Class Period, the terms of the Plan provided that TE Connectivity "shall contribute to the Plan for each pay period . . . an amount equal to five hundred percent (500%) of each [contribution] for each pay period up to one percent (1%) of the Participant's

[21] Excludes compounding—additional losses attributable to foregone investment returns.

Compensation for each pay period" (the "Basic Match"). *Id.* App. V § A(i)(1). The Plan further provides that employees who have completed ten years of service with TE Connectivity are entitled to supplemental matching contributions according to the following schedule (the "Supplemental Match" and together with the Basic Match, the "Employer Match"):

| Years of Service | Participant Contributes | Maximum Supplemental Matching Contributions Per Payroll Period |
|---|---|---|
| 10-19 | 2% | 1% |
| 20-24 | 3% | 2% |
| 25-29 | 4% | 3% |
| 30 or more | 5% | 4% |

*Id.* § A(i)(2).

80. In other words, TE Connectivity is contractually obligated to make the Basic Match to the Plan each time TE Connectivity pays Plan participants through its payroll process, and it is obligated to make the Supplemental Match each year for employees with at least ten years of service. The Employer Match is not discretionary, and its amount does not depend on the availability of forfeitures.

81. TE Connectivity paid the Employer Match every year during the Class Period according to the fixed formula set forth in the Plan. TE Connectivity's total contributions to the Plan (net of forfeitures applied to reduce them) were $44,609,452 in 2020; $46,997,652 in 2021; $49,466,196 in 2022; $46,874,312 in 2023; $47,330,800 in 2024; and $45,021,482 in 2025.[22]

**B. Vesting and Forfeiture of the Basic Match**

82. Under the terms of the Plan, participants are immediately vested in their own contributions as well as any actual earnings thereon. Plan § 6.1(a). In contrast, participants are not

[22] Form 5500, Schedule H, Line 2a(1)(A), Plan Years 2020–2025. Reported employer contributions are net of forfeitures applied to reduce them; the gross amount TE Connectivity was obligated to contribute under the Plan formula was correspondingly higher.

vested at all in the Basic Match until they have completed three years of service with TE Connectivity, at which point the participant's Basic Match becomes 100% vested. *Id.* § 6.2(b)(i).

83. To the extent a participant is not 100% vested upon termination of employment, the participant forfeits the value of TE Connectivity's contributions and any actual earnings thereon ("Forfeited Plan Assets" or "Forfeitures") in his or her account on the earlier of (a) the date the participant receives a total distribution of his or her vested account balance from the Plan or (b) the date he or she incurs five consecutive breaks in service. *Id.* §§ 6.3, 1.21. Because TE Connectivity employs a large workforce with substantial turnover, and because the Plan imposes a three-year cliff vesting schedule on the Basic Match, the Plan generates millions of dollars of Forfeited Plan Assets every year.

84. The Plan provides that "[a]mounts forfeited . . . by terminated Participants shall be reapplied in such a way as to reduce future Employer contributions under the Plan and/or to pay reasonable Plan administrative expenses as provided in Section 8.10." *Id.* § 3.3.

85. The Plan's audited financial statements, filed with the United States Department of Labor ("DOL") each year, confirm that Forfeited Plan Assets "may be used to reduce expenses or matching contributions."[23]

86. In other words, throughout the Class Period, the Plan gave Defendants two permissible uses for Forfeited Plan Assets—to defray the expenses of administering the Plan or to reduce TE Connectivity's contributions—and required Defendants to choose between those uses. Nothing in the Plan required that Forfeited Plan Assets be used to reduce TE Connectivity's contributions, and nothing in the Plan gave that use priority over defraying Plan expenses. By drafting the Plan with terms that gave Defendants discretion with respect to the use of Forfeited

[23] TE Connectivity Retirement Savings and Investment Plan, Form 5500 for Plan Years 2020–2025, Notes to Financial Statements, Note 1 ("Forfeitures").

Plan Assets, TE Connectivity necessarily required Defendants to consider, each year, whether using Forfeited Plan Assets to offset the Employer Match or to defray Plan expenses was in the best interest of Plan participants.

87. The Summary Plan Description for the Plan (the "SPD") does not tell participants how Forfeited Plan Assets are used. It does not disclose that forfeited amounts are applied to relieve TE Connectivity of its obligation to fund the Basic Match, and it does not disclose that the same amounts could instead have been used to eliminate the expenses deducted from participants' accounts. The SPD states only that participants who leave before vesting will forfeit the non-vested portion of their Plan accounts. SPD at 17.

**C. Defendants' Use of Forfeited Plan Assets During the Class Period**

88. The Plan's Forms 5500, including the audited financial statements attached to them, which are filed with the Department of Labor for each Plan year and publicly available, detail the amount of Forfeited Plan Assets generated each year, the use to which those Forfeited Plan Assets were put, and the amount of Plan expenses paid from Plan assets.

89. From 2020 through 2025, Defendants used Forfeited Plan Assets to reduce TE Connectivity's matching contributions in the following amounts: (1) $1,979,514 in 2020; (2) $1,075,984 in 2021; (3) $918,319 in 2022; (4) $1,676,798 in 2023; (5) $2,176,124 in 2024; and (6) $3,209,264 in 2025—a total of $11,036,003.[24]

90. From 2020 through 2025, Defendants used Forfeited Plan Assets to reduce plan expenses in the following amounts: (1) $0 in 2020; (2) $211,086 in 2021; (3) $0 in 2022; (4) $0 in 2023; (5) $659,900 in 2024; and (6) $750,000 in 2025—a total of $1,620,986.[25]

---

[24] Form 5500, Notes to Financial Statements, Note 1 ("Forfeitures"), Plan Years 2020–2025.
[25] *Id.*

91. As reflected above, Defendants did not elect to use a single dollar of Forfeited Plan Assets to offset Plan expenses in three of the six years during the Class Period despite millions of dollars being available in those years. Throughout the Class Period, of the $12,656,989 of Forfeited Plan Assets generated, Defendants only applied approximately $1.6 million—or about 13%—to offset Plan expenses.

92. A prudent and loyal fiduciary presented with this scenario would not have applied millions of dollars to offset TE Connectivity's contributions while Plan participants shouldered millions of dollars in administrative expenses. These actions by Defendants, at a minimum, necessitate the inference that imprudence or disloyalty was at play in their decision-making process.

93. The following Table demonstrates Defendants' imprudent, disloyal, and conflicted use of forfeitures during the Class Period:

**Table 5: Plan Forfeitures vs. Plan expenses Paid by Participants**

| Year | Forfeited Plan Assets Generated | Forfeitures Disclosed as Used to Offset TE Connectivity's Contributions | Forfeitures Disclosed as Used for Plan expenses | Total Plan expenses | Plan expenses Paid by the Plan and Participants |
|---|---|---|---|---|---|
| 2020 | $1,979,514 | Substantially all | $0 | $1,978,378 | $1,978,378 |
| 2021 | $1,287,070 | $1,075,984 | $211,086 | $2,503,363 | $2,292,277 |
| 2022 | $918,319 | Substantially all | $0 | $1,903,499 | $1,903,499 |
| 2023 | $1,676,798 | Substantially all | $0 | $1,471,895 | $1,471,895 |
| 2024 | $2,836,024 | $2,176,124 | $659,900 | $1,746,175 | $1,086,275 |
| 2025 | $3,959,264 | $3,209,264 | $750,000 | $1,687,780 | $937,780 |
| **Totals** | **$12,656,989** | **$11,036,003** | **$1,620,986** | **$11,291,090** | **$9,670,104** |

94. Forfeited Plan Assets exceeded the total Plan expenses in four of the six years during the Class Period. Had Defendants used Forfeited Plan Assets to pay Plan expenses,

participants would have paid nothing for the administration of the Plan in 2020, 2023, 2024, or 2025. In the two remaining years, 2021 and 2022, Forfeited Plan Assets could have covered 51% and 48% of Plan expenses, respectively. Upon information and belief, Defendants have continued this practice to the present.

95. From 2020 through 2025, had Defendants applied Forfeited Plan Assets toward Plan expenses first, participants' expense burden would have been reduced by $9,089,617—or approximately 81%—and would have still left approximately $3.6 million to offset TE Connectivity's employer contributions.

**D. Settlor Design Choices Versus Fiduciary Decisions About Forfeited Plan Assets**

96. When designing a defined contribution plan, an employer has a few limited options with respect to the treatment of forfeited plan assets. Employers that want all forfeited plan assets to be used first to reduce employer contributions prior to defraying plan expenses can draft the terms of the plan to explicitly require that. On the opposite end of the spectrum, some plans preclude or limit forfeited plan assets from being used to reduce employer contributions, or require that forfeited plan assets first be used to defray plan expenses.

97. In between these two poles are plans, like the Plan here, that accord discretion to their fiduciaries to use forfeited plan assets either to defray plan expenses or to offset employer contributions. In those instances, plan fiduciaries, as with any exercise of discretion over the use of plan assets, must use a prudent and loyal process to determine which of the allowable uses of forfeited plan assets would be consistent with their fiduciary duties. A plan fiduciary that exercises discretion to use forfeited plan assets to defray plan expenses is not providing a benefit greater than what was required or intended by the plan sponsor. Rather, plans that grant discretion to plan fiduciaries to choose among multiple different options for allocating forfeited plan assets,

including to defray plan expenses, necessarily contemplate that plan expenses will be defrayed if doing so complies with ERISA's fiduciary standards.

98. Critically, when a plan sponsor makes the decision to bind itself to provide matching contributions, it is acting as a settlor and not in a fiduciary capacity with respect to the plan and is therefore free to prioritize its own interests over those of the plan and its participants. In contrast, a plan fiduciary making fiduciary decisions based on the discretion granted by the plan sponsor is explicitly prohibited by ERISA from considering the interest of the employer. Designing a plan's contribution or vesting formula is a settlor function; choosing, year after year, how to spend money already held in the Plan's trust is not.[26]

99. Here, TE Connectivity made the settlor decision to adopt a fixed Basic Match formula and a three-year cliff vesting schedule, without any reference to the amount of Forfeited Plan Assets. Once those settlor decisions were made, Defendants knew the exact amount of the Basic Match that TE Connectivity was obligated to contribute, and the only decision left to them—how to use the Forfeited Plan Assets already held in the Plan's trust—was a fiduciary decision to be made under the circumstances then prevailing, solely in the interest of participants. It is therefore irrelevant to Defendants' decision-making process that the adoption of the Basic Match was itself a settlor act.

100. There is no dispute that under the terms of the Plan throughout the Class Period, defraying Plan expenses was, at a minimum, an allowable use of Forfeited Plan Assets. Accordingly, throughout the entire Class Period, a prudent fiduciary as part of a prudent fiduciary process would have always, at a minimum, considered whether using Forfeited Plan Assets to

[26] It is worth noting that it is a settlor function to decide whether or not to provide a matching contribution (unconstrained by any fiduciary duties to plan participants) whereas decisions regarding the use of forfeited plan assets already held in the plan's trust are constrained by ERISA's fiduciary duties.

defray Plan expenses was more consistent with its duties under the Plan and ERISA than using Forfeited Plan Assets to offset the Basic Match. At least once per year, a prudent plan fiduciary would have coordinated with TE Connectivity to determine how much, if any, of the Plan's administrative expenses TE Connectivity would pay, and would then have determined—for the exclusive purpose of providing benefits and defraying Plan expenses—how the remaining Plan expenses would be paid. A prudent, independent, and non-conflicted Plan fiduciary would have no reason to fail to use Forfeited Plan Assets to defray Plan expenses when that was an allowable option under the terms of the Plan and no factors weighed in favor of the other option.

### E. Defendants' Breaches of the Duty of Prudence

101. ERISA's fiduciary duty of prudence is violated where, as here, Defendants, faced with a decision each year in choosing between allocating Forfeited Plan Assets toward offsetting the mandatory Basic Match or defraying Plan expenses that would otherwise be borne by Plan participants, failed to conduct any investigation as to which choice would be in the best interest of the participants.

102. If Defendants had employed a prudent process every year immediately prior to and throughout the Class Period, Defendants would have used the Forfeited Plan Assets to defray all Plan expenses in four of six years of the Class Period.[27] In fact, however, Defendants often did not allocate any Forfeited Plan Assets to defray Plan expenses. Instead, after TE Connectivity bound itself, as settlor, to provide the Basic Match under a fixed formula, Defendants imprudently coordinated with TE Connectivity and the Plan's recordkeeper to calculate how much of the

[27] In other words, to the extent that the Forfeited Plan Assets exceeded the foreseeable future ongoing Plan expenses of the Plan as evaluated solely in the interest of Plan participants and for the exclusive purpose of providing benefits to participants and defraying the Plan expenses of the Plan, then the remaining Forfeited Plan Assets could be used to offset TE Connectivity's Basic Match. Here, Forfeited Plan Assets exceeded Plan expenses in four of six years of the Class Period. Defendants are solely in possession of the documents that would be necessary to review and evaluate that determination in detail.

Forfeited Plan Assets would be used to offset the Basic Match, while still allowing Plan expenses to be deducted from the accounts of Plan participants.

103. Because Defendants always had the ability to defray Plan expenses with Forfeited Plan Assets but often did not, it is reasonable to infer that Defendants employed a flawed decision-making process or did not employ any process at all to determine how to allocate Forfeited Plan Assets. The consistency of the outcome—with over 87% of forfeitures being used to reduce employer contributions and three years where Defendants allocated exactly $0 to defraying Plan expenses—is itself circumstantial evidence that no genuine, participant-focused process occurred.

104. Defendants did not, for example, investigate whether there was any set of circumstances that would support a decision to reduce the mandatory Basic Match prior to defraying Plan expenses, and there are no facts or circumstances that could possibly make Defendants' failure to use Forfeited Plan Assets to defray Plan expenses prudent.

105. First, there is no indication that using Forfeited Plan Assets to offset the Basic Match was necessary for TE Connectivity to maintain its past contribution levels. The Basic Match is a fixed formula applied every pay period under the terms of the Plan. Plan § 3.2. Every year throughout the Class Period, TE Connectivity's decisions related to the Basic Match were made without reference to the amount of Forfeited Plan Assets and were instead driven by the terms of the Plan, the requirements of Section 401(k)(13) of the Code, and the need to attract and retain talented employees. Companies like TE Connectivity use the amounts they have contributed as company contributions in prior years as part of their efforts to attract and retain employees in a competitive environment and rarely reduce or eliminate contributions to their plans because doing so would put them at a substantial competitive disadvantage.

106. The Plan expenses at issue are immaterial to both TE Connectivity's decision to provide the Basic Match and TE Connectivity's financial results. For example, in 2023, the amount of Plan expenses that Defendants caused Plan participants to pay through deductions from their Plan accounts ($1,471,895) comprised approximately 3.1% of the approximately $46.9 million TE Connectivity contributed to the Plan that year, and about 0.08% of TE Connectivity's $1.91 billion in net income in the same year.[28]

107. Second, there are no facts to suggest that TE Connectivity would be unable to meet its future Basic Match obligations, such that using Forfeited Plan Assets to offset the Basic Match was necessary, because if there were, TE Connectivity would have amended the Plan to eliminate or reduce the Basic Match. TE Connectivity had more than ample resources to fund the Basic Match without the subsidy. TE Connectivity plc's consolidated total revenues were $12.17 billion in 2020, $14.92 billion in 2021, $16.28 billion in 2022, $16.03 billion in 2023, $15.85 billion in 2024, and $17.26 billion in 2025, and its net income was -$241 million, $2.26 billion, $2.43 billion, $1.91 billion, $3.19 billion, and $1.84 billion, respectively. In 2024 alone, TE Connectivity returned approximately $2.8 billion to shareholders through share repurchases and dividends. The Forfeited Plan Assets Defendants used to subsidize TE Connectivity's contributions—a total of just over $11 million—were less than one-tenth of one percent (0.**1%)** of TE Connectivity's total net income from 2020 through 2025.

108. TE Connectivity was able to meet its contribution obligations throughout the Class Period and would have been able to meet its Basic Match obligation each year, even if no Forfeited Plan Assets were applied to offset its contributions. Indeed, TE Connectivity contributed between

[28] TE Connectivity, *TE Connectivity 2023 Annual Report: Together, Let's Engineer the Future*, 35 (last visited Oct. 22, 2026), https://www.te.com/content/dam/te-com/documents/about-te/our-company/global/annual-report/te-connectivity-annual-report-2023.pdf.

approximately $44.6 million and $49.5 million to the Plan in every year of the Class Period. A company that was contributing tens of millions of dollars to its Plan each year should not have reduced or eliminated its match over the $918,319 to approximately $2.0 million in annual expenses that Forfeited Plan Assets could have covered. And even if there were some indication that TE Connectivity would be unable to meet future Basic Match obligations, a prudent fiduciary would only offset the amount necessary to prevent that result and then allocate the remaining funds to other more beneficial options, like reducing Plan expenses shouldered by the Plan participants.

109. Third, that the Internal Revenue Code and Treasury regulations permit qualified plans to use forfeitures to reduce employer contributions speaks only to plan qualification. It says nothing about whether a fiduciary's exercise of discretion among permitted uses complied with ERISA's duties of prudence and loyalty.

110. Consequently, an objective analysis of the available options throughout the Class Period, guided by ERISA's fiduciary duty of prudence, would indisputably not result in Defendants choosing to use 87% of the Forfeited Plan Assets available to offset the Basic Match year after year throughout the Class Period instead of using Forfeited Plan Assets to defray Plan expenses. Instead of acting prudently by using Forfeited Plan Assets to defray Plan expenses charged to the individual accounts of Plan participants on an ongoing basis, Defendants chose to use the vast majority of the Forfeited Plan Assets for the purpose of offsetting TE Connectivity's Basic Match obligations to the Plan, thereby saving TE Connectivity millions of dollars at the expense of the Plan and its participants. Defendants' conduct, at the very least, necessitates the inference that either they did not have processes in place to weigh the benefits to participants of allocating Forfeited Plan Assets or, alternatively, the process employed was fatally flawed.

**F. Defendants' Breaches of the Duty of Loyalty**

111. Throughout the Class Period, loyal fiduciaries were required to make decisions with respect to the allocation of Forfeited Plan Assets "solely in the interest of the participants and beneficiaries and (A) for the exclusive purpose of: (i) providing benefits to participants and their beneficiaries; and (ii) defraying reasonable expenses of administering the plan." ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1). As discussed above, Defendants consistently prioritized TE Connectivity's interests over the Plan's by choosing to offset its contributions rather than to reduce the Plan's expenses.

112. Using Forfeited Plan Assets to reduce current and future employer contributions is always in the best interest of TE Connectivity because that option decreases TE Connectivity's own contribution costs and means that TE Connectivity does not need to take money out of its own general revenues to pay for its Basic Match obligations. Every dollar of Forfeited Plan Assets used to offset the Basic Match was a dollar TE Connectivity did not have to spend, and every such dollar flowed directly to TE Connectivity's bottom line.

113. There may possibly be a set of circumstances in which the option to reduce future employer contributions may be in the best interests of Plan participants when, e.g., there is a risk that the employer may be financially unable to satisfy its contribution obligations. In fact, however, in the event that a plan sponsor was in a questionable financial situation, in most cases the plan sponsor would simply exercise its settlor discretion to amend its plan document to eliminate any company contributions. And as described above, TE Connectivity was at all times able to fund its contributions. Absent a risk that TE Connectivity would be unable to satisfy its contribution obligations under the Plan, using Forfeited Plan Assets to defray Plan expenses would be in the

participants' best interest because that option would reduce or eliminate amounts otherwise charged to their accounts to cover such administrative expenses.

114. In deciding between using the Forfeited Plan Assets to benefit TE Connectivity or Plan participants, Defendants are presented with a conflict of interest in administering the Plan and managing and disposing of its assets. That conflict is acute here: the Plan vested the forfeiture decision in the discretion of Defendants (*see* Plan § 3.3), and the members of the Committees may be employees of TE Connectivity who serve at its pleasure, may be removed by it without cause, and are indemnified by it. *See* Plan §§ 8.2, 8.11. Upon information and belief, Defendants took no steps to account for that conflict—they did not consult an independent fiduciary or advisor, did not investigate whether TE Connectivity could fund the Basic Match without the subsidy, and did not evaluate whether Forfeited Plan Assets could eliminate the expenses charged to participants and still offset a portion of TE Connectivity's contributions.

115. In using Forfeited Plan Assets to primarily reduce TE Connectivity's Basic Match from 2020 through 2025, even though they were permitted to use those Forfeited Plan Assets to pay Plan expenses for participants, Defendants were motivated solely, or influenced, by TE Connectivity's interest and breached their duty of loyalty. TE Connectivity, while acting in its fiduciary capacity with respect to the use of Forfeited Plan Assets, was motivated by its own settlor and employer self-interest in reducing its costs; the Committees, whose members were TE Connectivity's employees, acted to serve that same interest rather than the exclusive interest of participants.

116. To be clear, Plaintiff does not allege that ERISA prohibits fiduciaries from ever using Forfeited Plan Assets to offset company contributions, and does not allege that the discretion conferred by the Plan is itself a violation of ERISA. Rather, Plaintiff alleges that under the specific

facts and context of this Plan—where Defendants were accorded discretion by the Plan over how to allocate Forfeited Plan Assets, where TE Connectivity's Basic Match was fixed and would have been paid regardless, where TE Connectivity was earning billions of dollars per year, where total Forfeited Plan Assets exceeded total Plan expenses in four of the six years of the Class Period, and where participants were being charged excessive RKA fees that Forfeited Plan Assets could have eliminated—a prudent and loyal fiduciary would not make the decisions that Defendants made (as alleged above). Here, under the circumstances described, it is reasonable to infer that Defendants did not employ a prudent and loyal fiduciary decision-making process and thus breached their fiduciary duties of prudence and loyalty.

**G. Losses to the Plan from the Misallocation of Forfeited Plan Assets**

117. Had Defendants used Forfeited Plan Assets to pay Plan expenses, TE Connectivity would have made the same Basic Match from its own funds, the Plan's assets would have been greater by the amount of Plan expenses charged to participants that could have been defrayed by forfeitures—$7,468,631 from 2020 through 2025, and additional amounts thereafter—and those amounts would have remained invested in participants' accounts, generating additional returns. The Plan's losses from Defendants' misuse of Forfeited Plan Assets therefore exceed $7.47 million before accounting for lost investment earnings, and will be proven with precision after discovery. The Plan would be made whole not because the Plan participants would receive an additional benefit, but because they would receive the full benefit they were entitled to under the Plan and ERISA for a defined contribution plan participant.

118. These losses are in addition to, and not duplicative of, the losses from excessive RKA fees alleged above. Had the Committees negotiated reasonable RKA fees and Defendants

applied Forfeited Plan Assets to pay them, participants would not have paid $7,468,631 of the $9,670,104 they actually paid, and the Plan would have retained the difference.

119. Plan participants were not informed of the decision-making process that Defendants employed to assess how to apply Forfeited Plan Assets, and Plaintiff need not plead with more particularity regarding Defendants' decision-making process at this time. *See Sweda*, 923 F.3d at 332 (although plaintiff "may not have directly alleged how [defendant] mismanaged the Plan," she "provided substantial circumstantial evidence from which the District Court could 'reasonably infer' that a breach had occurred"); *Braden v. Wal-Mart Stores, Inc.*, 588 F.3d 585, 598 (8th Cir. 2009) ("No matter how clever or diligent, ERISA plaintiffs generally lack the inside information necessary to make out their claims in detail unless and until discovery commences."). Plaintiff does not have access to the Committees' minutes, TE Connectivity's directions to the Recordkeepers regarding the forfeiture account, or any analysis Defendants performed regarding the use of Forfeited Plan Assets. Those materials are in Defendants' exclusive possession. Plaintiff's allegations regarding Defendants' process are based on the Plan's terms, the Plan's Form 5500 filings and audited financial statements, TE Connectivity's public financial disclosures, and the reasonable inferences drawn from Defendants' consistent, six-year course of conduct.

## VIII. CLASS ACTION ALLEGATIONS

120. ERISA authorizes any plan participant or beneficiary to bring an action individually on behalf of the plan for appropriate relief under 29 U.S.C. § 1109(a) for a plan fiduciary's breach of duty, including all losses resulting from such breach and such other equitable or remedial relief the court may deem appropriate. *See* 29 U.S.C. § 1132(a)(2).

121. Indeed, ERISA breach-of-fiduciary-duty actions generally hinge on the uniform conduct of plan fiduciaries with respect to the plan. *See Hughes*, 595 U.S. at 176–77.

122. Plaintiff brings this action on behalf of the Plan to recover all losses to the Plan resulting from Defendants' breaches, not merely the losses to Plaintiff's individual account. Because the excessive RKA fees were charged across the Plan as a result of Defendants' uniform conduct with respect to the Plan, the relief sought is Plan-wide.

123. In acting in this representative capacity and to enhance the due process protections of unnamed participants and beneficiaries of the Plan, as an alternative to direct individual actions on behalf of the Plan under 29 U.S.C. § 1132(a)(2) and (3), Plaintiff seeks to certify this action as a class action on behalf of all participants and beneficiaries of the Plan. Plaintiff seeks to certify, and to be appointed as the representative of, the following class (the "Class"):

> All current and former participants in or beneficiaries of the TE Connectivity Retirement Savings and Investment Plan (the "Plan") except Defendants from October 30, 2020, through the date of judgment (the "Class Period").

124. This action meets the requirements of Rule 23 of the Federal Rules of Civil Procedure and is certifiable as a class action for the following reasons.

125. Numerosity. The Class is so large that joinder of all members is impracticable. As of 2025, during the Class Period, the Plan had approximately 13,509 participants and beneficiaries. It would be economically infeasible and impractical for each class member to bring individual litigation.

126. Commonality. Common questions of law and fact predominate over any individualized questions, particularly: (a) whether the recordkeeping fees charged to the Plan were reasonable and competitive; (b) whether the Plan's fiduciaries breached their duties of prudence and care by failing to conduct competitive bidding, benchmarking, or comparative fee analysis; (c) whether lower-cost alternatives were available during the Class Period; (d) whether Defendants breached their duties of prudence and loyalty by using Forfeited Plan Assets to reduce TE

Connectivity's Basic Match rather than to defray Plan expenses; (e) whether Defendants' use of Forfeited Plan Assets caused Plan assets to inure to the benefit of TE Connectivity in violation of 29 U.S.C. § 1103(c)(1); (f) the appropriate measure of damages; and (g) what equitable and prospective relief is appropriate. Given that Defendants have engaged in a common course of conduct as to Plaintiff and the Class, similar or identical injuries and violations are involved, and common questions far outweigh any potential individual questions.

127. Typicality. The claims of Plaintiff are typical of the claims of the Class because Plaintiff was, and is, a Plan participant during the Class Period and all Plan participants were harmed by the uniform acts and conduct of Defendants discussed herein. Plaintiff, all Class members, and the Plan sustained monetary and economic injuries including, but not limited to, ascertainable losses in retirement income and retirement account value, arising from the same event, practice, and/or course of conduct as other members of the Class.

128. Adequacy. Plaintiff is an adequate representative for the Class because Plaintiff's interests do not conflict with the interests of the Class that he seeks to represent; Plaintiff was a Plan participant during the Class Period and continues to participate in the Plan; and Plaintiff is committed to vigorously representing the Class. Plaintiff has retained counsel who are competent and highly experienced in complex class action litigation—including ERISA and other complex class actions—and counsel intend to prosecute this action vigorously. The interests of the Class will be fairly and adequately protected by Plaintiff and Plaintiff's counsel.

129. Risk of Inconsistent/Dispositive Adjudications. Federal Rule of Civil Procedure 23(b)(1) Certification is appropriate because prosecution of separate actions by Class members would create the risk of (1) inconsistent or varying adjudications that would establish incompatible standards of conduct for Defendants concerning their discharge of fiduciary duties to the Plan and

personal liability to the Plan under 29 U.S.C. § 1109(a), and (2) adjudications by individual participants and beneficiaries regarding these breaches of fiduciary duties and remedies for the Plan would, as a practical matter, be dispositive of the interests of the participants and beneficiaries who are not parties to the adjudication, or would substantially impair those participants' and beneficiaries' ability to protect their interests.

130. Declaratory and Injunctive Relief. Federal Rule of Civil Procedure 23(b)(2) Certification is alternatively appropriate because Defendants have acted or refused to act on grounds that apply generally to the Class, so that final injunctive relief or corresponding declaratory relief is appropriate respecting the Class as a whole.

131. Predominance and Superiority. Federal Rule of Civil Procedure 23(b)(3) Certification is also appropriate because questions of law or fact common to the Class predominate over any questions affecting only individual members, and a class action is superior to other available methods for the fair and efficient adjudication of this controversy. Defendants' duties and conduct with respect to the Plan's RKA fees and the use of Forfeited Plan Assets were uniform as to all Class members, and any recovery will be on behalf of the Plan.

**COUNT I**
**Breaches of ERISA's Fiduciary Duty of Prudence**
**Pursuant to 29 U.S.C. § 1104(a)(1)(B) with Respect to Excessive Recordkeeping Fees**
**(Against Committee Defendants)**

132. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

133. At all relevant times, the Committees and their members (collectively, the "Committee Defendants") were fiduciaries of the Plan within the meaning of ERISA § 3(21)(A), 29 U.S.C. § 1002(21)(A), in that they exercised discretionary authority or control over the administration and/or management of the Plan or disposition of the Plan's assets.

134. As fiduciaries of the Plan, the Committee Defendants were subject to the fiduciary duties imposed by ERISA § 404(a), 29 U.S.C. § 1104(a). These fiduciary duties included managing the assets of the Plan for the sole and exclusive benefit of the Plan's participants and beneficiaries and acting with the care, skill, diligence, and prudence under the circumstances that a prudent person acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of like character and with like aims.

135. The Committee Defendants breached these fiduciary duties in multiple respects, as discussed throughout this Complaint. The Committee Defendants failed to employ a prudent process for monitoring the Plan's RKA fees, ensure that the Plan's RKA fees were objectively reasonable, defray reasonable expenses of administering the Plan, and act with the care, skill, diligence, and prudence required by ERISA. Instead, the Committee Defendants allowed Plan participants to pay excessive RKA fees throughout the Class Period.

136. A reasonably prudent fiduciary, following a reasonably prudent process, would have secured RKA fees substantially lower than those the Plan participants paid during the Class Period.

137. As a direct and proximate result of the breaches of fiduciary duties alleged herein, the Plan suffered millions of dollars of losses due to excessive costs and lower net investment returns. Had the Committee Defendants complied with their fiduciary obligations, the Plan would not have suffered these losses, and the Plan's participants would have had more money available to them for their retirement.

138. Each Committee Defendant is also liable for the losses caused by the breaches of its co-fiduciaries under ERISA § 405(a), 29 U.S.C. § 1105(a), because each knowingly participated in the other Committee Defendants' breaches, enabled those breaches through its own failure to

comply with ERISA § 404(a)(1), 29 U.S.C. § 1104(a)(1), or knew of those breaches and failed to make reasonable efforts under the circumstances to remedy them.

139. Pursuant to Sections 409 and 502(a)(2) and (a)(3) of ERISA, 29 U.S.C. §§ 1109 and 1132(a)(2)–(3), the Committee Defendants are liable to restore to the Plan all losses caused by their breaches of fiduciary duties and also must restore any profits resulting from such breaches. In addition, Plaintiff is entitled to equitable relief and other appropriate relief for the Committee Defendants' breaches as set forth in the Prayer for Relief.

**COUNT II**
**Party-in-Interest Prohibited Transactions**
**Pursuant to 29 U.S.C. § 1106(a)(1)(C)–(D) with Respect to Recordkeeping Fees**
**(Against All Defendants)**

140. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

141. Under ERISA, a plan fiduciary may not "cause the plan to engage in a transaction" if the fiduciary "knows or should know that such transaction constitutes a direct or indirect" (i) exchange of any property between the plan and a party in interest; (ii) furnishing of services between the plan and a party in interest; or (iii) transfer of any assets of the plan to a party in interest. 29 U.S.C. § 1106(a)(1)(A), (C), (D).

142. ERISA § 3(14), 29 U.S.C. § 1002(14), defines a "party in interest" to include, among other things, (A) "any fiduciary . . . of such employee benefit plan;" (B) "a person providing services to such plan;" (C) "an employer any of whose employees are covered by such plan;" and (H) "an employee, officer, director" of such an employer or servicer.

143. Northwest and Empower, during their respective periods as recordkeeper for the Plan, were parties in interest because they provided services to the Plan as the Plan's recordkeepers. *See* 29 U.S.C. § 1002(14)(B); *Cunningham*, 604 U.S. at 697.

144. Defendants' decision to agree to pay excessive fees to the Recordkeepers during the Class Period for the Plan amounted to a direct or indirect "furnishing of goods, services, or facilities between the plan and a party in interest" pursuant to ERISA § 406(a)(1)(C) and the "transfer to, or use by or for the benefit of a party in interest, of any assets of the plan" pursuant to ERISA § 406(a)(1)(D).

145. Defendants caused the Plan to engage in the transactions with actual or constructive knowledge that the transactions constituted a direct or indirect furnishing of services between the Plan and the Recordkeepers and a transfer of Plan assets to, or for the benefit of, the Recordkeepers.

146. At all relevant times, Defendants knew or should have known that the Recordkeepers were parties in interest within the meaning of ERISA § 3(14), 29 U.S.C. § 1002(14).

147. The compensation the Recordkeepers received was not reasonable, and the exemption in 29 U.S.C. § 1108(b)(2) is therefore unavailable. In any event, that exemption is an affirmative defense on which Defendants bear the burden of proof. *Cunningham*, 604 U.S. at 700–02.

148. Each payment of RKA fees from Plan assets to the Recordkeepers during the Class Period, and each renewal, extension, or amendment of the Plan's recordkeeping arrangements during the Class Period, constituted a separate prohibited transaction. At the time of each such transaction, the applicable Recordkeeper was already providing services to the Plan and was therefore a party in interest.

149. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants, as fiduciaries to the Plan, are liable to restore to the Plan all losses caused by their violations of ERISA §§ 406(a)(1)(A), (C), and (D) and for such other equitable or remedial relief as the Court deems appropriate.

**COUNT III**
**Breach of ERISA's Fiduciary Duty of Loyalty**
**Pursuant to 29 U.S.C. § 1104(a)(1)(A) with Respect to the Disloyal Allocation of Plan Forfeitures**
**(Against All Defendants)**

150. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

151. Defendants were fiduciaries of the Plan with respect to the use of Forfeited Plan Assets. TE Connectivity held and exercised the discretion over Forfeited Plan Assets, and the Committee Defendants controlled the operation and administration of the Plan and the disbursement of its subject funds. *See* 29 U.S.C. § 1002(21)(A). In making the annual decision as to how Forfeited Plan Assets already held in the Plan's trust would be used, each Defendant was acting in a fiduciary, not a settlor, capacity.

152. When exercising discretion and control over Forfeited Plan Assets and using them to reduce TE Connectivity's Basic Match, instead of defraying the reasonable costs of administering the Plan or allocating the Forfeited Plan Assets back to eligible Plan participants, Defendants considered the best interest of TE Connectivity as opposed to the best interest of participants, in violation of ERISA.

153. Defendants' decisions to use Forfeited Plan Assets to reduce TE Connectivity's Basic Match instead of defraying reasonable Plan expenses as required by ERISA were motivated solely by and for the exclusive benefit of TE Connectivity, and Defendants took no steps to account for the conflict of interest inherent in that decision.

154. As a direct and proximate result of Defendants' fiduciary breaches described herein, the Plan and Class suffered injury and loss for which Defendants are personally liable and are subject to appropriate equitable relief, pursuant to 29 U.S.C. § 1109, including, without

limitation, the disgorgement of all ill-gotten profits to Defendants resulting from the breach of their duty of loyalty.

155. To the extent that any Defendant did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each Defendant is liable under 29 U.S.C. § 1105(a) because it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of its specific responsibilities giving rise to its fiduciary status, and/or knowingly failed to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

156. Plaintiff and the Class have suffered losses as a direct result of Defendants' breaches of their duty of loyalty.

**COUNT IV**
**Breach of ERISA's Fiduciary Duty of Prudence**
**Pursuant to 29 U.S.C. § 1104(a)(1)(B) with Respect to the Imprudent Allocation of Plan Forfeitures**
**(Against All Defendants)**

157. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

158. When exercising discretion and control over Forfeited Plan Assets and using them to reduce TE Connectivity's Basic Match, Defendants failed to act with the care, skill, prudence, and diligence under the circumstances then prevailing that a prudent man acting in a like capacity and familiar with such matters would use in the conduct of an enterprise of a like character and with like aims, when those aims are to act solely in the interest of the Plan participants and beneficiaries and for the exclusive purpose of providing benefits to Plan participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA.

159. When deciding how to allocate Forfeited Plan Assets, Defendants utilized an imprudent and flawed process, or no process at all. Despite the conflict of interest presented by alternatives under both ERISA and the Plan document, Defendants failed to undertake any reasoned and impartial decision-making process to determine whether using the Forfeited Plan Assets to reduce TE Connectivity's own contribution expenses, as opposed to paying Plan expenses or for other purposes allowable under ERISA, was in the best interest of the Plan's participants or was prudent, and failed to solely consider which alternative would promote the exclusive purpose of providing benefits to Plan participants and their beneficiaries and defraying reasonable expenses of administering the Plan, in violation of ERISA.

160. By refusing to use Forfeited Plan Assets to eliminate Plan expenses that were instead charged to participant accounts, and instead deciding to use these Plan assets to reduce TE Connectivity's own contribution expenses, Defendants imprudently caused the value of the Plan's assets to decrease by causing Plan participants to incur expense deductions from their individual accounts that would otherwise have been covered in whole or in part by utilizing the Forfeited Plan Assets to pay Plan expenses.

161. Had Defendants conformed with the minimum standard of care required under ERISA, Defendants would not have used Forfeited Plan Assets to reduce TE Connectivity's Basic Match without first using some or all of them to pay Plan expenses. Alternatively, had Defendants conformed with the minimum standard of care required under ERISA, they would have used a larger portion of Forfeited Plan Assets to defray reasonable expenses of administering the Plan.

162. Plaintiff and the Class have suffered losses as a direct result of Defendants' breaches of their duty of prudence. Each Defendant is personally liable under 29 U.S.C. § 1109(a) to make good to the Plan any losses to the Plan resulting from the breaches of its fiduciary duties

alleged in this Count. Each Defendant is also subject to other equitable or remedial relief as appropriate.

163. To the extent that any Defendant did not directly commit any of the foregoing breaches of fiduciary duty, at the very minimum, each Defendant is liable under 29 U.S.C. § 1105(a) because it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of its specific responsibilities giving rise to its fiduciary status, and/or knowingly failed to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

**COUNT V**
**Breach of ERISA's Anti-Inurement Provision**
**Pursuant to 29 U.S.C. § 1103(c)(1) with Respect to the Use of Plan Forfeitures**
**(Against All Defendants)**

164. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

165. Pursuant to 29 U.S.C. § 1103(c)(1), "the assets of a plan shall never inure to the benefit of any employer and shall be held for the exclusive purposes of providing benefits to participants in the plan and their beneficiaries and defraying reasonable expenses of administering the plan."

166. Forfeited Plan Assets are assets of the Plan. When a participant forfeits the non-vested portion of his or her Basic Match, the Forfeited Plan Assets remain in, and are held by, the Plan's trust until Defendants decide how they will be used. Forfeited Plan Assets are therefore subject to ERISA's anti-inurement provision.

167. TE Connectivity is the Plan's sponsor and the employer of the Plan's participants. Under the terms of the Plan, TE Connectivity is contractually obligated to make the Basic Match

according to a fixed formula, and the Employer Match is not discretionary and does not depend on the availability of forfeitures.

168. From 2020 through 2025, Defendants used $11,036,003 of Forfeited Plan Assets to reduce TE Connectivity's matching contributions, while applying only $1,620,986 of Forfeited Plan Assets to Plan expenses and leaving participants to pay $9,670,104 in Plan expenses from their own accounts.

169. By using Forfeited Plan Assets to reduce TE Connectivity's matching contributions—thereby saving TE Connectivity more than $11 million that it was otherwise obligated to contribute to the Plan from its own funds—Defendants caused the assets of the Plan to inure to the benefit of TE Connectivity, in violation of 29 U.S.C. § 1103(c)(1).

170. The benefit to TE Connectivity was neither incidental nor ancillary to the provision of benefits to participants. Each dollar of Forfeited Plan Assets applied to the Basic Match was a dollar that TE Connectivity was already obligated to contribute and thus provided participants with no benefit beyond what the Plan already guaranteed them. At the same time, each such dollar was a dollar that was not used to defray the Plan expenses deducted from participants' accounts. Defendants made this choice year after year throughout the Class Period, sometimes failing to allocate even a single dollar of Forfeited Plan Assets toward Plan expenses.

171. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), Defendants are liable to restore to the Plan all losses caused by their violations of ERISA's anti-inurement provision and must restore to the Plan any profits resulting from such violations. In addition, Plaintiff is entitled to equitable relief and other appropriate relief pursuant to 29 U.S.C. § 1132(a)(3), as set forth in the Prayer for Relief.

172. To the extent that any Defendant did not directly commit any of the foregoing violations, at the very minimum, each Defendant is liable under 29 U.S.C. § 1105(a) because it was a co-fiduciary and knowingly participated in (or concealed) a breach by another fiduciary, enabled another fiduciary to commit breaches of fiduciary duty in the administration of its specific responsibilities giving rise to its fiduciary status, and/or knowingly failed to cure a breach of fiduciary duty by another fiduciary and/or failed to take reasonable efforts to remedy the breach.

## COUNT VI
## Failure to Adequately Monitor Other Fiduciaries
## (Against TE Connectivity)

173. Plaintiff re-alleges and incorporates herein by reference all prior allegations in this Complaint as if fully set forth herein.

174. TE Connectivity had the authority to appoint, oversee, and remove members of the Committees and knew or should have known that the Committees had critical responsibilities for the Plan, including the selection and monitoring of the Plan's recordkeepers and their compensation and the allocation of Forfeited Plan Assets.

175. In light of this authority, TE Connectivity had a duty to monitor those individuals responsible for Plan RKA fees on the Committees to ensure that they were adequately performing their fiduciary obligations, and to take prompt and effective action to protect the Plan in the event that these individuals were not fulfilling those duties.

176. TE Connectivity had a duty to ensure that the individuals responsible for RKA services on the Committees possessed the needed qualifications and experience to carry out their duties (or use qualified advisors and service providers to fulfill their duties), had adequate financial resources and information, and maintained adequate records of the information on which they based their decisions and analysis with respect to the Plan.

177. The objectively imprudent, disloyal, and conflicted manner in which the Committees handled the Plan's RKA fees and Forfeited Plan Assets inferentially establishes that Defendant TE Connectivity breached its duty to monitor by, among other things:

a. Failing to monitor and evaluate the performance of the Committees with respect to the Plan's RKA fees or have a system in place for doing so, standing idly by as the Plan suffered significant losses in the form of objectively unreasonable RKA fees;

b. Failing to monitor the process by which the Plan's recordkeepers, Northwest and Empower, were evaluated and failing to investigate the availability of more reasonably priced recordkeeping services in a timely manner;

c. Failing to remove members of the Committees whose performance was inadequate in that they continued to pay the same RKA fees even though solicitation of competitive bids would have shown that maintaining the Recordkeepers as the recordkeepers at the contracted price was imprudent and excessively costly, all to the detriment of the Plan and Plan participants' retirement savings;

d. Failing to monitor and evaluate the performance of the Committees with respect to Forfeited Plan Assets or have a system in place for doing so, standing idly by as the Plan misallocated Forfeited Plan Assets for TE Connectivity's benefit; and

e. Failing to remove members of the Committees whose performance was inadequate in that they continued to misallocate Forfeited Plan Assets for the benefit of TE Connectivity.

178. The unreasonably high annual costs of the Plan, when compared to substantially similar plans with the same or substantially similar RKA services, and the consistent application of Forfeited Plan Assets to TE Connectivity's benefit over the Plan participants in every year of

the Class Period, were—or should have been—red flags to TE Connectivity that the Committees were not fulfilling their duties.

179. As a consequence of the breaches of the duty to monitor with respect to the Plan's RKA fees and Forfeited Plan Assets, Plaintiff and participants suffered millions of dollars of objectively unreasonable and unnecessary monetary losses.

180. Pursuant to 29 U.S.C. §§ 1109(a) and 1132(a)(2), TE Connectivity is liable to restore to the Plan all losses caused by its failure to adequately monitor the Committees and their members. In addition, Plaintiff is entitled to equitable relief and other appropriate relief as set forth in the Prayer for Relief.

## IX. PRAYER FOR RELIEF

**WHEREFORE,** Plaintiff prays that judgment be entered against Defendants on all claims and requests that the Court award the following relief:

181. A determination that this action may proceed as a class action under Rule 23(b)(1), or in the alternative Rule 23(b)(2) or 23(b)(3), of the Federal Rules of Civil Procedure;

182. Designate Plaintiff as Class Representative, and appoint the firms Milberg, PLLC as Class Counsel;

183. Award a declaration stating that Defendants have breached their fiduciary duties under ERISA and caused the Plan to engage in transactions prohibited by ERISA § 406(a)(1)(C) and (D), 29 U.S.C. § 1106(a)(1)(C) and (D), and caused Plan assets to inure to the benefit of TE Connectivity in violation of ERISA § 403(c)(1), 29 U.S.C. § 1103(c)(1);

184. Enter an Order compelling the Defendants to make good to the Plan all losses to the Plan resulting from Defendants' breaches of fiduciary duty, including without limitation restoring to the Plan all losses resulting from each violation of ERISA described above;

185. Enter an Order requiring Defendants to restore to the Plan any profits they made through the use of Plan assets in connection with the prohibited transactions alleged herein, pursuant to ERISA § 409(a), 29 U.S.C. § 1109(a);

186. Award actual damages in the amount of any losses the Plan suffered, to be allocated among the participants' individual accounts in proportion to the accounts' losses;

187. Enter an Order enjoining Defendants from any further violation of their ERISA fiduciary responsibilities, obligations, and duties, and from causing the Plan to engage in further transactions prohibited by ERISA § 406(a), 29 U.S.C. § 1106(a);

188. Award other equitable relief to redress Defendants' illegal practices and to enforce the provisions of ERISA as may be appropriate, including appointment of an independent fiduciary or fiduciaries to run the Plan and removal of Plan fiduciaries deemed to have breached their fiduciary duties;

189. Apportion all amounts recovered for the Plan among the Plaintiff and the Class;

190. Award pre- and post-judgment interest;

191. Award Plaintiff and the Class their attorneys' fees and costs pursuant to 29 U.S.C. § 1132(g) and the common fund doctrine; and

192. Award such other and further relief as the Court deems equitable and just.

DATED: October 30, 2026

Respectfully submitted,

/s/ *Michael Acciavatti*

Michael Acciavatti (PA Bar No. 324112)
**MILBERG, PLLC**
405 East 50th Street
New York, NY 10022
Tel: (212) 594-5300
macciavatti@milberg.com

Alexandr Rudenco*
**MILBERG, PLLC**
800 S. Gay Street, Suite 1100
Knoxville, TN 37929
Tel: (866) 252-0878
arudenco@milberg.com

**Pro Hac Vice Application Forthcoming*

*Counsel for Plaintiff and*
*the Putative Class*

## CERTIFICATE OF SERVICE

The undersigned hereby certifies that on October 30, 2026, the foregoing document has been filed electronically and is available for viewing and download via the Court's electronic case filing ("ECF") system.

Dated: October 30, 2026

*/s/ Michael Acciavatti*
Michael Acciavatti (PA Bar No. 324112)